GLANCY BINKOW & GOLDBERG LLP
LIONEL Z. GLANCY (#134180)
MICHAEL GOLDBERG (#188669)
EX KANO S. SAMS II (#192936)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
E-mail: info@glancylaw.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EDWARD STELLINI, Derivatively on Behalf of Himself and All Others Similarly Situated, | Case No.  **'12CV0373 W    BLM** |
| Plaintiff, | |
| vs. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| WALTER P. HAVENSTEIN, A. THOMAS YOUNG, FRANCE A. CÓRDOVA, JERE A. DRUMMOND, THOMAS F. FRIST, JOHN J. HAMRE, MIRIAM E. JOHN, ANITA K. JONES, JOHN P. JUMPER, HARRY M.J. KRAEMER, JR., LAWRENCE C. NUSSDORF, EDWARD J. SANDERSON, JR., and LOUIS A. SIMPSON, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| -and- | |
| SAIC, INC., | |
| Nominal Defendant. | |

**INTRODUCTION**

1.　　Plaintiff, by and through his attorneys, brings this action derivatively on behalf of nominal defendant SAIC, Inc.  ("SAIC" or the "Company") and alleges upon personal knowledge as to himself and his own acts, and as to all other matters based upon the investigation conducted by his attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, documents, analyst reports, news reports, press releases, and other publicly-available information regarding the Company, as follows:

2.　　This is a shareholder derivative action brought on behalf of the Company against the members of its Board of Directors ("Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and other violations of the law that occurred from at least 2000 through the present ("Relevant Period").

3.　　Since 2000, SAIC has developed and implemented an automated timekeeping and workforce management system called CityTime for certain agencies of the City of New York.  Defendants breached their fiduciary duties to the Company by overbilling the City of New York for time recorded by the CityTime program manager.  In December 2010, the U.S. Attorney's Office for the Southern District of New York filed a criminal complaint against six individuals, including principals of staffing firms that provided staff to the CityTime program as subcontractors to SAIC.  In February 2011, a federal grand jury indicted four of the individuals and added another individual defendant.  In May 2011, a criminal complaint was filed against the former CityTime program manager, alleging that he conspired to defraud the City of New York into extending and overpaying for the CityTime project and personally received kickbacks totaling $5.6 million.

4.     Subsequently, in June 2011, SAIC disclosed that an internal investigation could not validate all of the time recorded to the City of New York by its program manager.  Later – in October 2011 – the Company disclosed that it had removed certain members of the CityTime management team from their positions and terminated their employment.  SAIC has admitted that its financial results were significantly impacted by a $232 million loss provision taken by the Company relating to the investigations concerning the CityTime workforce management contract.  Thus, the Individual Defendants breached their fiduciary duties to the Company and have subjected the Company to hundreds of millions of dollars in losses, adverse publicity, additional costs and potential fines, and other occurrences harmful to the Company.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(2), as plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

6.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in, and maintains operations in, this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper in this Court under 28 U.S.C. §1391(a) because: (1) one or more defendants either reside in, or maintain executive offices in, this District; (2) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary

participation in the wrongful acts detailed herein, occurred within this District, and (3) defendants have received substantial compensation in this District by conducting business herein and by engaging in numerous activities that have had an effect in this District.

## PARTIES

8.     Plaintiff Edward Stellini is a current shareholder of SAIC and has been a shareholder of the Company during the Relevant Period.  Plaintiff is a citizen of the State of Ohio.

9.     SAIC is a provider of scientific, engineering, systems integration and technical services and solutions to all branches of the United States military and to governmental agencies.  Science Applications International Corporation, the principal operating company of SAIC, was formed in 1969.  In October 2006, in connection with becoming a publicly-traded company, Science Applications International Corporation completed a reorganization merger in which it became a 100%-owned subsidiary of SAIC, after which SAIC completed an initial public offering of its common stock.  Prior to November 2009, SAIC had Class A preferred stock and common stock outstanding.  In November 2009, each share of SAIC Class A preferred stock was converted into one share of common stock, which increased the number of common shares outstanding and eliminated the preferred shares outstanding.  SAIC is incorporated in the State of Delaware with its principal executive offices located at 1710 SAIC Drive, McLean, Virginia.  Science Applications International Corporation is incorporated in the State of Delaware with its principal executive offices located at 10260 Campus Point Drive, San Diego, California.

10.     Defendant Walter P. Havenstein ("Havenstein") is, and at all relevant times was, Chief Executive Officer ("CEO") and a director of SAIC.  Havenstein joined SAIC as CEO and

as a director in September 2009.  From January 2007 until joining SAIC, Havenstein served as Chief Operating Officer ("COO") and member of the Board of Directors for BAE Systems plc, a $34 billion global aerospace and defense company, and as President and CEO of its U.S. subsidiary, BAE Systems, Inc., with 53,000 employees and annual sales in excess of $20 billion. From August 2005 to August 2007, Havenstein served as President of the Electronics & Integrated Solutions Operating Group of BAE Systems, Inc. and served as Executive Vice President since January 2004.  Previously, Havenstein was President of BAE Systems' Information and Electronic Warfare Systems business unit.  Havenstein was also President of the Sanders defense electronics business prior to it being acquired by BAE from Lockheed Martin in 2000.  Before joining Sanders in 1999, Havenstein was Vice President and General Manager of the Strategic Systems Division of Raytheon.  Plaintiff is informed and believes, and thereupon alleges, that Havenstein is a citizen of the State of Virginia.

11.    Defendant A. Thomas Young ("Young") is, and at all relevant times was, a director of the Company.  Young has served as a director since July 1995.  Young retired from Lockheed Martin Corp. in 1995, after serving as an Executive Vice President from March 1995 to July 1995.  Prior to its merger with Lockheed Corporation, Young served as the President and COO of Martin Marietta Corp. from 1990 to 1995. Plaintiff is informed and believes, and thereupon alleges, that Young is a citizen of the State of Florida.

12.    Defendant France A. Córdova ("Córdova") is, and at all relevant times was, a director of the Company.  Córdova has served as a director Since February 2008.  Córdova has been President of Purdue University since 2007.  Córdova was Chancellor at the University of California, Riverside, from July 2002 to July 2007, and was Vice Chancellor for Research and Professor of Physics at University of California, Santa Barbara from August 1996 to July 2002.

Córdova also served as Chief Scientist of the National Aeronautics and Space Administration from 1993 to 1996, and headed the Department of Astronomy and Astrophysics at Pennsylvania State University from 1989 to 1993.  Córdova is also a member of the Board of Directors of Edison International and of Southern California Edison.  Plaintiff is informed and believes, and thereupon alleges, that Córdova is a citizen of the State of Indiana.

13.    Defendant Jere A. Drummond ("Drummond") is, and at all relevant times was, a director of the Company.  Drummond has served as a director since July 2003.  Drummond was employed by BellSouth Corporation from 1962, until his retirement in December 2001. Drummond also served as Vice Chairman of BellSouth Corporation from January 2000, until his retirement.  He was President and CEO of BellSouth Communications Group, a provider of traditional telephone operations and products, from January 1998 until December 1999. Drummond was also President and CEO of BellSouth Telecommunications, Inc. from January 1995 until December 1997.  Drummond is also a member of the Boards of Directors of Borg-Warner Automotive and AirTran Holdings, Inc.  Plaintiff is informed and believes, and thereupon alleges, that Drummond is a citizen of the State of North Carolina.

14.    Defendant Thomas F. Frist ("Frist") is, and at all relevant times was, a director of the Company.  Frist has served as a director since September 2009.  Frist is a principal of Frist Capital LLC, a private investment vehicle for Frist and certain related persons, and has held such position since 1994.  Previously, Frist co-managed FS Partners, L.L.C. and worked at Rainwater, Inc. in Fort Worth, Texas and in New York.  Since 2006, Frist has served on the Board of Directors of HCA, Inc.  Plaintiff is informed and believes, and thereupon alleges, that Frist is a citizen of the State of Tennessee.

15.    Defendant John J. Hamre ("Hamre") is, and at all relevant times was, a director of the Company.  Hamre has served as a director since June 2005.  Hamre has served as the President and CEO of the Center for Strategic & International Studies, a public policy research institution, since 2000.  Hamre is also a member of the Boards of Directors of ITT Industries, Inc., Oshkosh Corporation and MITRE Corporation.  Plaintiff is informed and believes, and thereupon alleges, that Hamre is a citizen of the State of Maryland.

16.    Defendant Miriam E. John ("John") is, and at all relevant times was, a director of the Company.  John has served as a director since June 2007.  John retired from Sandia National Laboratories, a science and engineering laboratory, in September 2006, after having served as Vice President of Sandia's California Division from April 1999 to September 2006.  John previously served in a number of managerial and technical roles for Sandia from 1982 to 1999. John also serves on the boards of a number of federally funded national security laboratories. Plaintiff is informed and believes, and thereupon alleges, that John is a citizen of the State of California.

17.    Defendant Anita K. Jones ("Jones") is, and at all relevant times was, a director of the Company.  Jones has served as a director since January 1998.  Jones is University Professor Emerita at the University of Virginia, where she has taught since 1989.  Jones also served as one of the Company's directors from 1987 to 1993.  Plaintiff is informed and believes, and thereupon alleges, that Jones is a citizen of the State of Virginia.

18.    Defendant John P. Jumper ("Jumper") is, and at all relevant times was, a director of the Company.  Jumper has served as a director since June 2007.  Jumper is also a member of the Boards of Directors of Goodrich Corporation, Jacobs Engineering Group Inc. and Somanetics Corporation.  Plaintiff is informed and believes, and thereupon alleges, that Jumper

is a citizen of the State of Virginia.

19.    Defendant Harry M.J. Kraemer, Jr. ("Kraemer") is, and at all relevant times was, a director of the Company.  Kraemer has served as a director since April 1997.  Kraemer has been an executive partner of Madison Dearborn Partners, LLC, a private equity investment firm, since April 2005, and has served as a professor at the Kellogg School of Management at Northwestern University since January 2005.  Kraemer previously served as the Chairman of Baxter International, Inc., a health-care products, systems and services company, from January 2000 until April 2004, as CEO of Baxter from January 1999 until April 2004, and as President of Baxter from April 1997 until April 2004.  Kraemer also served as the Senior Vice President and CFO of Baxter from November 1993 to April 1997.  Kraemer is also a member of the Boards of Directors of Sirona Dental Systems, Inc. and VWR International.  Plaintiff is informed and believes, and thereupon alleges, that Kraemer is a citizen of the State of Illinois.

20.    Defendant Lawrence C. Nussdorf ("Nussdorf") is, and at all relevant times was, a director of the Company.  Nussdorf has served as a director since September 2010.  Nussdorf has been President and COO of Clark Enterprises, Inc., a privately held investment and real estate company, since 1998.  Nussdorf has managed the day-to-day operations of the company for more than 30 years, and is responsible for all aspects of its financial, investment and legal activities and directs the company's business strategies for growth and diversification.  Plaintiff is informed and believes, and thereupon alleges, that Nussdorf is a citizen of the District of Columbia.

21.    Defendant Edward J. Sanderson, Jr. ("Sanderson") is, and at all relevant times was, a director of the Company.  Sanderson has served as a director since October 2002. Sanderson retired from Oracle Corporation in 2002 as an Executive Vice President after having

served since 1995. At Oracle, Sanderson was responsible for Oracle Product Industries, Oracle Consulting and the Latin American Division. Prior to Oracle, Sanderson was President of Unisys Worldwide Services and a partner at both McKinsey & Company and Accenture (formerly Andersen Consulting).  Plaintiff is informed and believes, and thereupon alleges, that Sanderson is a citizen of the State of California.

22.     Defendant Louis A. Simpson ("Simpson") is, and at all relevant times was, a director of the Company.  Simpson has served as a director since July 2006.  Simpson has also served as President and CEO, Capital Operations, of GEICO Corporation, an automobile insurance company, since May 1993.  Simpson previously served as Vice Chairman of the Board of Directors of GEICO from 1985 to 1993.  Simpson is also a member of the Board of Directors of VeriSign, Inc.  Plaintiff is informed and believes, and thereupon alleges, that Simpson is a citizen of the State of Florida.

23.     Defendants Havenstein, Young, Córdova, Drummond, Frist, Hamre, John, Jones, Jumper, Kraemer, Nussdorf, Sanderson, and Simpson are collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

24.     By reason of their positions as officers and directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their

personal interests or benefit.

25.   Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information concerning the Company's revenue, margins, operations, performance, management, projections, and forecasts, so that the market price of the Company's stock would be based on truthful and accurate information.

26.   The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their executive, managerial, and/or directorial positions within the Company, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and misrepresentations made.

27.   At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of such agency.

28.   To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

   a.   manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

b.      neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

c.      establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.      neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.      properly and accurately guide investors and analysts regarding the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h.      remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

29.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.  The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

30.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein, and by failing to prevent employees and/or officers of the Company from taking such illegal actions.

31.     Additionally, the Company has established a Code of Business Conduct of the Board of Directors ("Code") that applies to all directors of the Company.  The conduct of the Individual Defendants alleged herein constitutes a violation of the Company's Code.  The Code provides, among other things, the following:

> Ethics and integrity of action are core values at SAIC. This document defines the code of business conduct of the directors of SAIC and embodies their commitment to pursue the highest standards of ethical conduct. This Code is intended to describe areas of ethical risk, provide guidance to directors and help foster a culture of honesty and accountability.
>
> **Conflicts of Interest**
>
> Directors should avoid any conflicts between their own personal or business interests and the interests of SAIC. A conflict of interest can arise when a

director takes actions or has interests that may make it difficult to perform his or her work for SAIC objectively and effectively, or when a director, or a member of his or her immediate family* receives improper personal benefits as a result of his or her position as a director of SAIC. Even the appearance of a conflict of interest should be avoided. If a director becomes aware of an actual or potential conflict of interest with SAIC, he or she should promptly inform the Chair of the Ethics and Corporate Responsibility Committee. If the director's independence could be impaired, the director should also notify the Chair of the Board and the Chair of the Nominating and Corporate Governance Committee to consider what action, if any, may be required. In the case of a material conflict of interest, the director may be required to tender his or her resignation.

Some of the more common conflicts that directors should avoid are listed below:

> ***Relationship with third-parties doing business with SAIC.*** Directors may not receive a personal benefit from a person or firm that is seeking to do business with SAIC. A director should recuse himself or herself from any Board decision involving another firm or company with which the director has a business relationship.

> ***Organizational conflicts of interest.*** Directors involved with multiple organizations should avoid situations that are, or appear to be, organizational conflicts of interests. Such situations may arise, for example, when a director simultaneously serves on the board of directors of a customer, supplier or competitor.

> ***Compensation from non-SAIC sources.*** Directors may not accept payment for services performed for SAIC from any source other than SAIC.

> ***Personal use of SAIC assets.*** Directors may not use SAIC information or assets (including employee labor) for their own personal benefit unrelated to their role as an SAIC director.

> ***Gifts.*** Directors may not offer, give or receive gifts from those who deal with SAIC where the gift is being made to influence the directors' actions as members of the Board, or where acceptance of the gift could create the appearance of a conflict of interest.

**Confidentiality**

Directors must maintain the confidentiality of information not generally known to the public and entrusted to them as directors, except when disclosure is appropriate in light of the context or is legally required.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Directors must not take for themselves or their companies business opportunities that they learn about as a director of SAIC and must not compete with SAIC for business.

**Compliance with Laws, Rules and Regulations; Fair Dealing**

Directors must comply with laws, rules and regulations applicable to their role as a director of SAIC, including the following:

*Insider Trading*. Directors are expected to comply with SAIC's Insider Trading and Disclosure Policy and applicable laws prohibiting trading in securities of SAIC or its business partners if the director has material, non-public information about them.

*Communications with Government Personnel*. A director's discussions with current or former federal government employees, including military personnel, must comply with applicable restrictions on recruiting them to work for SAIC or serve on SAIC's board.

*Participation in the Political Process*. Directors are expected to conduct their political activities and interactions with government officials in accordance with applicable law.  Certain states and localities have "pay-to-play" laws, which may restrict and/or require disclosure of political donations by SAIC, its employees, or its directors. These laws may also apply to political contributions by certain family members of directors. The scope of family members covered depends on the jurisdiction and circumstances, but generally covers spouses and dependent children. Directors should avoid, and should attempt to ensure that their covered family members avoid, making political contributions that could restrict SAIC's business or violate these laws.

*Procurement Integrity and Use of Competitive Information.* Directors should avoid knowingly obtaining bid or proposal-related information about a competitor. If a director obtains confidential information about a competitor, customer or supplier of SAIC, the director should not convey that information to SAIC. Directors should avoid discussions with SAIC's competitors that could restrain competition or otherwise violate antitrust laws, such as discussions involving non-public or sensitive information about SAIC's or a competitor's costs, profits, pricing, bids, markets and similar competitive information.

*Gifts, Gratuities and Bribes*. Directors should not offer or give a gift or gratuity to any customer or U.S. or foreign government official, or accept or solicit a gift from any supplier, where doing so could

influence a government official or create a perception that favorable treatment is being sought, received or given, except as permitted by law.

***Compliance with U.S. Export and Sanctions Regulations***. In accordance with U.S. export regulations, directors are responsible for protecting export-controlled information received in their capacity as a director from unauthorized disclosure to foreign persons or entities.

In addition to complying with laws and regulations, directors should deal fairly with SAIC's customers, suppliers, competitors and employees. Directors are encouraged to consult with SAIC's General Counsel if they have any questions about their compliance with applicable rules or about SAIC's business practices.

**Waiver of Code of Ethics**
Any waiver of this Code may be made only by the Board of Directors and must be promptly disclosed to SAIC's stockholders.

**Reporting Misconduct and Seeking Guidance**

Directors should promptly inform the Chair of the Ethics and Corporate Responsibility Committee of any violations of this Code that come to their attention. Violations will be investigated and the Board will take appropriate action. Directors may consult with the Chair of the Ethics and Corporate Responsibility Committee, the General Counsel or the Senior Vice President, Ethics and Compliance if they have any questions about this Code.

No code or policy can anticipate every situation that may arise, or replace thoughtful and ethical behavior. Directors are encouraged to bring questions about particular circumstances that may implicate one or more of the provisions of this Code to the attention of the Chair of the Ethics and Corporate Responsibility Committee, the General Counsel or the Senior Vice President, Ethics and Compliance. All information required to be reported or disclosed by this Code is based on the best knowledge of the director.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

32.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their common plan or design.   In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective

duties.

33. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did:

(a) Conceal the fact that the Company was improperly misrepresenting its financial results in order to allow defendants to artificially inflate the price of the Company's shares;

(b) Maintain the Individual Defendants' executive and directorial positions at the Company and the profits, power, and prestige that the Individual Defendants enjoyed as a result of these positions; and

(c) Deceive the investing public, including shareholders of the Company, regarding the Individual Defendants' management of the Company's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financial condition that had been misrepresented by the Individual Defendants throughout the Relevant Period.

34. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

35. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct during the Relevant Period. During this time, the Individual Defendants caused the Company to conceal material facts, misrepresent its financial results, and violate applicable laws. In addition, the Individual Defendants also made other specific, false statements about the Company's financial performance and future business prospects, as alleged herein.

36.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things: (1) to disguise the Individual Defendants' breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment; (2) to conceal adverse information concerning the Company's operations, financial condition, and future business prospects; and (3) to artificially inflate the price of the Company's stock so that the Individual Defendants could protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

37.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise, and/or common course of conduct alleged herein.

38.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs alleged herein.  In taking such actions to substantially assist the commission of the wrongdoing alleged herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing.

## BACKGROUND

39.     SAIC is a provider of scientific, engineering, systems integration and technical services and solutions to all branches of the U.S. military, agencies of the U.S. Department of Defense ("DOD"), the intelligence community, the U.S. Department of Homeland Security

("DHS") and other U.S. Government civil agencies, state and local government agencies, foreign governments and customers in select commercial markets.  The Company's business is focused on solving issues of national and global importance in the areas of national security, energy and the environment, critical infrastructure and health.  SAIC is focusing its investments to expand the Company' business in areas emphasizing: (1) intelligence, surveillance and reconnaissance; (2) cyber security; (3) logistics, readiness and sustainment; (4) energy and environment; and (5) health technology.

40.     The Company's business is conducted in three reportable segments: (1) Government; (2) Commercial; and (3) Corporate and Other.  SAIC defines its reportable segments based on the way the Company's chief operating decision maker manages SAIC's operations for the allocation of resources, decision making and performance assessment.  The Company's operating business units are aggregated into the Government or Commercial segments, depending on the nature of the customers served, the contractual requirements and the regulatory environment governing the business unit's operations.  The Corporate and Other segment includes the operations of the Company's internal real estate management subsidiary, various corporate activities and certain corporate expense items that are not reimbursed by SAIC's U.S. Government customers.  The Company's Corporate and Other segment does not contract with third-parties for the purpose of generating customer revenues.  Substantially all of the Company's revenues and tangible long-lived assets are generated by, or owned by, entities located in the United States.

**THE INDIVIDUAL DEFENDANTS' WRONGFUL CONDUCT**

41.     For more than ten years, the City of New York has been developing and attempting to implement CityTime, an initiative to modernize the payroll system for New York

City employees.  The project was originally budgeted to cost the City of New York $63 million to complete, but it has resulted in costing more than $600 million, with additional expenditures still required.

42.    SAIC was the primary contractor on CityTime.  Between 2003 and 2010, Gerald Denault ("Denault") was an employee of SAIC, and served as SAIC's Program Manager for CityTime.   Among other things, Denault was responsible for: (1) selecting and overseeing subcontractors hired by SAIC to assist with CityTime; (2) submitting bills to the City of New York seeking payment for work purportedly performed by SAIC employees and subcontractors on CityTime; and (3) developing proposed CityTime work orders.  Denault was also responsible for developing contract amendments seeking approval for SAIC to perform additional work on the project.  Carl Bell ("Bell") worked as Chief Systems Engineer in the New York office of SAIC from 2003 to 2011.  Between 2003 and 2010, the City of New York disbursed over $600 million to SAIC in connection with CityTime.

43.    From 2003 to 2010, there was a massive scheme to defraud the City of New York in connection with CityTime.  The individuals primarily responsible for the project collaborated in an effort to overbill and otherwise defraud the City of New York.  As a result, virtually all of the $600 million that the City of New York paid to SAIC for CityTime was tainted by fraud.  For instance, Denault used his authority at SAIC to cause consultants to be hired at inflated rates, to artificially delay the implementation of the project, and to approve work orders for unnecessary staffing increases.   Additionally, SAIC executives received millions of dollars in kickbacks in connection with work steered to Technodyne LLC ("Technodyne"), the primary subcontractor for CityTime.  For example, Denault and Bell were each paid five dollars for every hour worked by every consultant hired by, or through,

Technodyne.   Denault also received an additional two dollars for every hour worked by a

consultant for D.A. Solutions and Prime View.   As a result, Denault received more than $9

million in kickbacks, and Bell received at least $5 million in kickbacks.

44.   A June 20, 2011 *New York Times* article reported the following regarding this

scheme:

> Nearly all of the $600 million that New York City has paid to the main
> contractor for its troubled automated payroll project has been tainted by fraud,
> prosecutors said Monday in announcing a new indictment that charged two
> technology executives and their company in what a United States attorney called
> a "massive and elaborate scheme."
>
> "Today we allege what many have long feared: The CityTime project was
> corrupted to its core by one of the largest and most brazen frauds ever committed
> against the City of New York," Preet Bharara, the United States attorney for
> Manhattan, said at a news conference.
>
> It was the first time that Mr. Bharara, who was joined by Rose Gill Hearn, the
> commissioner of the city's Department of Investigation, had held a news
> conference about CityTime since the scandal broke in December. The new
> indictment also adds accusations against six other people who had been
> previously charged in the case.
>
> In addition to announcing the new indictment, prosecutors said the chief systems
> engineer in the New York office of the contractor, Science Applications
> International Corporation, had pleaded guilty to charges and was the second
> central figure to cooperate with the authorities. Prosecutors also said the fraud
> was much more systemic than they had first realized, and stretched back to 2003,
> two years earlier than they had said previously.
>
> While no city official has been implicated, investigators suggested that the
> Bloomberg administration, which was deeply invested in the project and anxious
> for the technology to work, had failed to recognize what Mr. Bharara said was a
> scheme that "appears to have metastasized over time."
>
> Ms. Gill Hearn said, "The individuals charged today understood, exploited and
> preyed upon the city's desire to modernize its timekeeping and payroll
> operations for more than 160,000 employees."
>
> The latest indictment names Reddy and Padma Allen, the top executives at
> TechnoDyne L.L.C., a married couple who are naturalized American citizens
> from India. Padma Allen, at least, was a businesswoman of some standing: a

medical doctor by training, she attended a White House briefing in December on minority business issues, and she was named one of Ernst & Young's entrepreneurs of the year in New Jersey in 2010.

Prosecutors alleged in papers unsealed on Monday that "the vast majority of TechnoDyne's business and the engine of its growth was business it secured from S.A.I.C. in exchange for paying kickbacks." And after the Allens in December became aware of the federal investigation, they provided "false talking points" to Carl Bell, the S.A.I.C. systems engineer, in order to throw off investigators, according to prosecutors.

In all, 11 people and one company, TechnoDyne, have been charged in the case, which has stained the third term of Mayor Michael R. Bloomberg. One defendant has died, and two have entered guilty pleas and agreed to cooperate with the authorities.

When asked about the latest developments, Marc LaVorgna, a spokesman for Mr. Bloomberg, said: "Our Department of Investigation uncovered this fraud, bringing it to federal prosecutors, and we will be using all available avenues to recover any funding owed to the city. S.A.I.C. has been removed from the project, and substantial reforms have been made to the way large city contracts are managed."

According to investigators, the scheme was hatched by Mark Mazer, a consultant to the city's Office of Payroll Administration, who, owing to his close relationship with the office's executive director, Joel Bondy, enjoyed unusually wide latitude in approving contracts. (Mr. Bondy resigned in December, but has not been charged with any crime.)

The defendants are accused of defrauding the city by hiring consultants who were not needed, inflating the rates charged for consulting work and — in an irony, given the project's subject matter about timekeeping — inflating the hours worked by consultants.

Over all, the city paid over $600 million to Science Applications International, which employed two people who were named in the indictment unsealed on Monday: Gerard Denault, who had been the CityTime project manager at Science Applications International, and Mr. Bell, who pleaded guilty to charges that included wire fraud conspiracy, wire fraud and money-laundering conspiracy.

According to the indictment, Mr. Denault and Mr. Bell directed $400 million from Science Applications International to TechnoDyne, of Wayne, N.J., as the CityTime project's primary information technology subcontractor, in exchange for $15 million in kickbacks. TechnoDyne paid $75 million to two smaller subcontractors, who then provided $25 million in kickbacks to Mr. Mazer, the

indictment says. One of those subcontractors has entered a guilty plea and is cooperating with the authorities.

After Mr. Denault was arrested late last month, and the Allens were indirectly referenced as co-conspirators, TechnoDyne abruptly halted its operations.

Lawyers for TechnoDyne and Mr. Bell did not return calls seeking comment. It could not be determined whether the Allens had a lawyer. A lawyer for Mr. Mazer, Gerald Shargel, said, "A change in the indictment does not change the fact that Mark Mazer committed no fraud."

A spokeswoman for Science Applications International declined to comment.

But the tale of the Allens is hardly over. Earlier this year, the two apparently fled to India, and their whereabouts are unknown to federal authorities. Jacques Semmelman, an expert in international extradition, said extradition could take anywhere from a few months to a few years. But Mr. Bharara was unbowed.

"We will take all the steps to locate them," he said, "and bring them to justice in New York."

45.     Similarly, a June 21, 2011 *Wall Street Journal* article entitled, "CityTime Project Awash in 'Fraud'" reported the following:

Fraud permeated "virtually every level" of the development of New York City's long-delayed and over-budget automated payroll system, U.S. Attorney Preet Bharara said Monday as he announced the indictments of two New Jersey executives accused of paying off contractors.

Padma and Reddy Allen, the top executives at TechnoDyne, a consulting company that worked on the city payroll system known as CityTime, were accused of handing out more than $40 million in kickbacks as part of an elaborate scheme to defraud city taxpayers. The couple had already returned to their native India, and authorities are pursuing them.

TechnoDyne, which abruptly fired all its employees in recent weeks as the investigation heated up, was also indicted. Mark Lerner, whom Mr. Allen identified in a email to employees as TechnoDyne's legal counsel, didn't return a request for comment.

Another individual, Carl Bell, a chief systems engineer at Science Applications International Corp., the lead contractor on CityTime, pleaded guilty last week to receiving millions of dollars in kickbacks. He is cooperating with authorities.

In total, 11 people, plus TechnoDyne, have been charged in the continuing investigation. Two, including Mr. Bell, have pleaded guilty, and one has died.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

On Monday, Mr. Bharara referred to the first round of charges in this case – six people in December – as the "tip of the iceberg."

"Unfortunately, in just the few months since the first announcement of arrests, we have developed evidence that the corruption on CityTime was epic in duration, magnitude and scope," he said.

The fraud allegedly involved more than $600 million in city funds, more than $40 million in kickbacks and an international network of shell companies and accountants created for the sole purpose of laundering cash, Mr. Bharara said.

"The CityTime project was corrupted to its core by one of the largest and most brazen frauds ever committed against the city of New York," Mr. Bharara said at a downtown news conference.

The alleged corruption scheme has proved to be an embarrassment to Mayor Michael Bloomberg, whose reputation as an expert manager has been damaged by the case. Critics have accused the mayor and his administration of failing to monitor the project and effectively guard against fraud.

The CityTime project has suffered from massive cost-overruns since its inception in the 1990s. The cost of the project has ballooned to more than $700 million from about $68 million. Roughly 165,000 employees are on the system today.

In a statement, Mr. Bloomberg's spokesman, Marc LaVorgna said, "Our Department of Investigation uncovered this fraud, bringing it to federal prosecutors, and we will be using all available avenues to recover any funding owed to the city."

SAIC has been removed from the project and "substantial reforms" have been made to the way large city contracts are managed, Mr. LaVorgna said. A spokeswoman for SAIC said she was aware of Monday's developments but declined to comment.

According to the indictment, TechnoDyne and the Allens agreed to pay Mr. Bell and Gerard Denault, who was the project manager for SAIC, $5 each for every hour worked by every TechnoDyne consultant hired to work on CityTime. Mr. Denault allegedly received more $9 million in kickbacks, and Mr. Bell received over $5 million in kickbacks.

Mr. Denault has denied any wrongdoing, and his attorney has said he ultimately will be vindicated.

Mr. Bharara declined to say whether authorities in India are cooperating with law-enforcement officials in the U.S. as they pursue the Allens.

Rose Gill Hearn, commissioner of the city Department of Investigation, compared investigators' efforts to follow the money in the alleged scheme as akin to "tracking a ricocheting pinball, from contractor to subcontractor, to shell companies and foreign bank accounts, and, eventually, into the defendants' pockets."

During the probe, authorities have seized or frozen more than $38 million from more than 120 accounts and safe deposit boxes.

46.     Additionally, a June 29, 2011 *wNYC* article entitled, "CityTime Payroll Scandal a Cautionary Tale" reported the following:

Closing the city's $600 million dollar budget gap was not without tough trade offs. A thousand workers will lose their jobs, and to save $6 million dollars, the city will end its commitment to thousands of kids who had been promised college scholarships for keeping a B average. The shortfall that prompted the hard choices is roughly the same amount federal prosecutors say was involved in a massive case of contract fraud that has come to be shorthanded as CityTime. It's a cautionary tale of what can happen when the city drops the ball on oversight for just one of its 47,000 private contracts.

Preet Bharara, the U.S. Attorney for the Southern District of New York, did not sugarcoat his description of the CityTime scandal when describing it earlier this month to reporters.

"The crimes alleged in today's superseding indictment are truly jaw dropping," said Baharara. "They reveal one of the most elaborate and massive schemes to defraud the city ever charged." The city's Department of Investigation, led by Rose Gill Hearn, initiated the case and brought it to Baharara's office on the sprawling case.

The irony here is rich. "The massive scheme" started as an outsourced city contract to design a payroll system that would precisely track the hours worked by city employees. After a couple of false starts with other vendors, defense contractor Scientific Applications International Corporation was awarded the job in a no-bid contract by the Giuliani Administration.

Under Mayor Bloomberg, the contract ballooned from $63 million where it had started out in the Giuliani years , to more than $700 million. Federal prosecutors now say at least $600 million of that was "tainted." At every level, federal prosecutors allege grafters had honeycombed CityTime in to a paragon of corruption.

"Between 2003 and 2010, the CityTime payroll project served as a vehicle for an unprecedented fraud, which appears to have metastasized over time," said Baharara.

The prime contractor was the defense contractor Scientific Applications International Corporation. The city's contract database notes SAIC has been the subject of "multiple investigations by the Department of Defense, the U.S. Department of Justice, NASA and the General Services Administration." Citing the criminal probe, SAIC had no comment for this story.

Back in 2005, prosecutors say SAIC got a whistleblower tip about company employee Gerald Denault, SAIC's CityTime manager, saying Denault was deliberately slowing down the project and raised the possibility he was taking kickbacks from subcontractors. Prosecutors say SAIC took a look for five months but found no evidence of wrongdoing.

Meanwhile, Denault continued on an upward corporate trajectory.

"Gerald Denault allegedly used his authority at SAIC to cause consultants to be hired at inflated rates, to artificially delay the implementation of the project, and to approve work orders for staffing increases that were not necessary," said Baharara.

Official oversight for this project rested with a three-person panel including Mayor Bloomberg's Budget Director Mark Page, a representative for than Comptroller Bill Thompson, and Joel Bondy, who led the Office of Payroll Administration up until he was fired after the first indictments came down last year. Despite this oversight, Attorney Baharara says the private contractors and consultants were able to manipulate the terms of their contracts and inflate the costs eleven times its original estimate. Bondy and Page declined to comment for this story.

"Because of their efforts, the contract went from a fixed-price contract to a fixed-price level of effort contract. What that meant is that from then on, it would be the city - not SAIC - that would become largely responsible for future cost overruns. What followed as described in the indictment was a dramatic acceleration in costs with the city on the hook for all of it," explained Baharara.

What prosecutors have yet to publicly discuss is the role played by former city officials from both the Giuliani and Bloomberg administrations that acted as lobbyists on behalf of SAIC and subcontractors such as New Jersey-based Technodyne.

This month Technodyne, and its husband-and-wife ownership team of Padma and Reedy Allen, were indicted for their role in the conspiracy that netted

Technodyne $450 million dollars of city funds via SAIC. Prosecutors contend it was 80 percent of Technodyne's business.

The city's lobbying database shows a small army of former prominent city officials who did work for SAIC and Technodyne. Defense contractor SAIC has retained former City Comptroller Liz Holtzman, Peter Powers, who served as Mayor Giuliani's top deputy Mayor for operations, and Seth Kaye, who worked in both the Giuliani and Bloomberg administrations. Technodyne's lobbyists include former Bloomberg Department of Information Technology and Telecommunications Commissioner Gino Menchini and Agostino Cangemi, who also held key posts in both administrations.

National Strategies, the lobbying firm that employs Menchini and Cangemi, says the firm had no role in CityTime and discontinued working "on general business procurement" for Technodyne as soon as the criminal allegations surfaced. (Another Technodyne lobbyist of record, Sal Salamone, was director of the Mayor's Office of Computer Planning and has worked for SAIC.)

Watchdog group Common Cause Executive Director Susan Lerner says as the city increasingly turns to outside contractors, these contractors turn to former city employees as lobbyists to influence the contracts.

"Simultaneous with that shift, you get a massive explosion in lobbyists because now you are not just lobbying on behalf of a company that does or doesn't want certain regulation," she says. "Now you're lobbying on behalf of a company that is looking at a job which could be $400 million dollars worth of city money."

In December of last year, federal prosecutors and the DOI alleged initially that another nest of fraudsters had exploited CityTime, walking away with more than $80 million dollars. They charged that "subject matter expert" Mark Mazer, who was supposed to be monitoring the contract work on CityTime, had actually used his position to orchestrate an international kickback scheme.

At the time, Mayor Bloomberg tasked Deputy Mayor for Operations Stephen Goldsmith with evaluating the city's largest information technology contracts. Goldsmith conceded that the city had erred in sub-contracting even the quality assurance oversight of CityTime out to multiple layers of contractors. He vowed to have city employees play a more active role in monitoring contracts and conceded the migration of city officials into the world of contracting could be problematic.

"If a revolving door means you have city employees on the contractor side at higher salaries, I think there is some evidence of that and we are concerned about it," he told WNYC.

Meanwhile, Technodyne founders Reedy and Padma Allen have yet to be taken into custody. They are facing multiple counts of bribery and corruption on their 450 million share of the CityTime money. But finding them will be a challenge. City lobbying records list one of Technodyne's addresses as 576 Valley Road, a UPS mailbox in Wayne, New Jersey.

"They rented one of my big postal boxes, says Mr. Choi who owns the Wayne UPS Store. "I have not seen them for awhile but they are paid up through July." Prosecutors claim the Allens are now in India.

City Comptroller John Liu announced today that he is freezing $42 million of money left to be paid to SAIC pending the outcome of the federal investigation. And Liu joined the Financial Information Services Agency board of directors in approving a plan to transition management of payroll system away from outside contractors to city workers.

"This transition is possible because of the significant progress achieved due to the new paradigm we established in September forcing the project on the right track at no further expense to taxpayers to build the system," Liu said in a statement. "As we move forward, it is my hope that the city will be able to recoup every dollar stolen from taxpayers, and that the administration will continue to cut down on the use of outside consultants."

47.     An October 25, 2011 *Washington Technology.com* article entitled, "SAIC sacks 3 execs in wake of CityTime scandal probe" also reported the following:

Science Applications International Inc. has fired three key executives for alleged failures of proper management during the CityTime kickback scheme in New York City.

In an Oct. 24 memo to all employees, SAIC CEO Walt Havenstein said, "The kind of behavior we have seen in CityTime is criminal and is an affront to everything SAIC stands for as a company."

"That's why the actions of those involved are so appalling to me and to all of us at the company," he added.

The CityTime project, launched in 1998, was designed to update and streamline municipal employee records. But investigations by prosecutors, following a whistleblower's tip, showed CityTime to be an international conspiracy with contractors earning kickbacks for inflated hours billed to the city. Two of those indicted have fled the country.

A comprehensive review of the CityTime program, including a review of management performance, concluded there were failures of management with

respect to the program and that certain management changes are essential, Havenstein said.

"Consequently, Deborah Alderson, Defense Solutions Group president; John Lord, deputy group president; and Peter Dube, general manager of the Enterprise and Mission Solutions Business Unit, have been removed from their positions and are no longer with the company," the memo said.

On an interim basis, Thomas Baybrook, general manager of the Defense and Maritime Solutions Business Unit, will act as group president; and Rick Reynolds, currently deputy general manager of the Enterprise and Mission Solutions Business Unit, will serve as general manager of that business unit.

New York Mayor Michael Bloomberg has called for SAIC to repay the city more than $600 million spent on the project.

In his memo to employees Havenstein said, "SAIC developed and delivered the customized, one-of-a-kind workforce management system that is CityTime covering 163,000 city employees. It is fully implemented, delivering results, and saving time and money for New York City today."

At least 11 people have been indicted so far, including Carl Bell, the project's main systems engineer.

Bell was fired by SAIC in January. He pled guilty in June and in a plea agreement with federal prosecutors is cooperating with the ongoing investigation.

SAIC project manager Gerard Denault was indicted in June.

Havenstein said SAIC is aware of no evidence that the three executives who were fired had any personal involvement in the fraud, "and while each has made valuable contributions to SAIC, we must maintain the highest standards for all of our employees and for our industry, beginning with our management team."

48.     Similarly, an October 31, 2011 *DefenseMediaNetwork.com* article entitled, "SAIC Fires Three Key Executives in IT Scandal" reported the following:

Like many other large American corporations, defense contractor SAIC has placed a lot of emphasis on ethical business conduct as a series of corporate scandals have made front-page news in recent years.

Indeed, the company trumpeted the release last year of its Corporate Responsibility Report, a copy of which is posted on SAIC's website.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

27

As it turns out, not all of the company's managers appear to have agreed with the report's conclusion that "We believe high ethical standards are essential to the achievement of our individual and corporate goals."

SAIC recently fired three senior executives, two of them related to defense operations, as part of a scandal involving alleged kickbacks at a New York city information technology project begun in 1998 that is hundreds of millions of dollars over budget.

The CityTime project also has led to several criminal charges; nearly a dozen individuals have been indicted to date. These include SAIC project manager Gerard Denault, indicted in June, and Carl Bell, the New York project's main systems engineer. Fired last January, Bell pled guilty in June and is cooperating with federal prosecutors.

In a blunt memo to employees, CEO Walt Havenstein said he had dismissed Deborah Alderson, Defense Solutions Group president; John Lord, deputy group president; and Peter Lord, general manager of the Enterprise and Mission Solutions Business Unit. The company announced earlier in October that Havenstein would be retiring.

"The kind of behavior we have seen in CityTime is criminal and is an affront to everything SAIC stands for as a company," Havenstein said. "SAIC has a long and proud history, with an outstanding reputation for integrity and strong ethical business practices. That's why the actions of those involved are so appalling to me and to all of us at the company."

But the CEO also noted SAIC has no evidence linking the three fired executives to any CityTime fraud.

"While each has made valuable contributions to SAIC," he continued in his memo, "we must maintain the highest standards for all of our employees and for our industry, beginning with our management team."

The firings come at a time when big American companies and Wall Street have come under more intense scrutiny for ethical conduct. Federal prosecutors in recent months have won several high-profile insider trading convictions that drew lengthy sentences, and protestors in the Occupy Wall Street movement have railed against alleged "corporate greed."

SAIC finds itself engulfed in this larger pattern because of its involvement in the controversial and scandal-plagued CityTime IT program. Prosectors allege CityTime became an international conspiracy in which lead contractors earned kickbacks for hours worked by consultants that resulted in unneeded staff and inflated hours billed to the city.

Begun 13 years ago, the CityTime payroll project covering more than 160,000 municipal workers was originally supposed to cost just $63 million. It has since ballooned to a cost of roughly 10 times that amount.

In light of the indictments, executive firings and federal investigation, New York Mayor Michael Bloomberg said he wants SAIC to repay more than $600 million.

But despite the dismissals and public recriminations, Havenstein indicated he intends to take a hard line with Bloomberg's financial demands. In his memo to employees, Havenstein noted SAIC had delivered a customized management system that works well and is saving money for the citizens of New York.

Meanwhile, Havenstein said SAIC is "building vigorous safeguards against such behavior in the future." Key to those are the CEO's decision to hire the prominent Gibson Dunn law firm to conduct a thorough analysis of key SAIC policies and practices.

The lawyers also expected to recommend changes to strengthen what Havenstein said is SAIC's "culture of ethics, accountability, and compliance."

49.    On December 8, 2011, SAIC filed its quarterly report for the period ended October 31, 2011.  Within its Form 10-Q, the Company announced the following:

***Timekeeping Contract with City of New York***

Since 2000, the Company has performed under a systems development and implementation contract relating to an automated time and attendance and workforce management system (CityTime) for certain agencies of the City of New York (City). The Company has billed approximately $635 million under the contract, which was completed on June 30, 2011.

The U.S. Attorney's Office for the Southern District of New York is conducting a criminal investigation relating to the CityTime program. In December 2010, the U.S. Attorney's Office filed a criminal complaint against six individuals who were either employees of the quality assurance vendor that was under a direct contract with the New York City Office of Payroll Administration, or were principals of staffing firms that provided staff to the CityTime program as second-tier subcontractors to the Company, or were otherwise relatives of those individuals. On February 10, 2011, a federal grand jury indicted four of the individuals and added another individual defendant. On May 27, 2011, a criminal complaint was filed against a former Company employee who was the program manager on the CityTime contract. The complaint alleged that this former program manager conspired to defraud the City into extending the duration of and overpaying for the CityTime project in order to generate kickbacks for himself. It also alleged that he defrauded the Company by

depriving it of his honest services, and charged him with money laundering to conceal proceeds of the fraudulent schemes.

On June 15, 2011, a federal grand jury in the Southern District of New York filed an indictment that superseded the February 2011 indictment naming the original defendants and charging the former Company program manager with violating various federal statutes relating to the alleged kickback scheme, including charges of conspiracy, wire fraud against the City of New York, honest services fraud against the Company and obstruction of justice. The indictment alleged that the former Company program manager received kickbacks totaling at least $9 million from the primary subcontractor, Technodyne LLC, and other second-tier subcontractors. Technodyne and its principals were also charged in the June 2011 indictment. Another former Company employee, a chief systems engineer, pleaded guilty in June 2011 to multiple criminal charges related to the same fraudulent scheme and admitted to taking at least $5 million in kickbacks from the primary subcontractor, Technodyne. The fraudulent scheme described in the June 2011 indictment alleges that individuals from the Company (the former program manager and the former chief systems engineer), Technodyne, the second-tier subcontractors and others collaborated to defraud the City by overbilling and inflating the price paid by the City under the contract, all to illegally enrich themselves. In addition, although the Company is not charged in the June 2011 indictment, the indictment also alleges that the Company paid to Technodyne hundreds of millions of dollars under the contract after receiving an internal complaint raising suspicions of kickbacks from Technodyne to the former program manager. The Company is continuing to cooperate with the U.S. Attorney's investigation but cannot predict its outcome

Statements have been issued from the City's Office of the Mayor and Office of the Comptroller indicating that the City's Department of Investigation would conduct a more extensive investigation regarding the CityTime contract, and that the City would withhold payment of amounts owing to the Company until the investigation was complete. In addition, these statements have also indicated that the City intends to pursue the recovery of costs associated with the CityTime program that the City's investigation reveals were improperly charged to the City. On June 29, 2011, the Company received a letter from New York City Mayor Michael Bloomberg, which requests that the Company reimburse the City for approximately $600 million paid by the City to the Company for CityTime and the cost of investigating and remediating the CityTime program.

After a comprehensive review of the CityTime program, including a review of management performance, a Group President, a Deputy Group President and a Business Unit General Manager responsible for management and oversight on the CityTime program were removed from their positions and are no longer with the Company. The Company is not aware of any evidence that these

individuals had any personal involvement in the fraud in the CityTime program. The Company has engaged an outside law firm to undertake a review of key policies and practices in the Company and to recommend changes to strengthen the Company's culture of ethics, accountability, and compliance. In addition, a Special Committee of the Board of Directors that is overseeing the Company's response to CityTime has engaged an independent company to undertake its own review and monitor the efforts the Company is making in response to this matter.

The Company believes that a loss related to the outcome of the CityTime investigations is probable. Based on developments relating to the CityTime investigations, the Company now estimates that its loss will be at least $232 million and has recorded a loss provision of that amount as of October 31, 2011, consisting of a $52 million reduction in revenue and a $180 million charge to selling, general and administrative expenses. An additional loss is reasonably possible, but an estimate of the maximum amount of such loss currently cannot be estimated given that no legal proceedings have been filed against the Company and the investigations are ongoing and involve complex matters with third parties outside the control of the Company. Accordingly, the outcome of these investigations may result in additional damages and penalties, and criminal fines, restitution and other remedies, including suspension or debarment from government contracting, any of which could have a material adverse effect on the Company's consolidated financial position, results of operations and cash flows.

50.    Throughout the Relevant Period, the Individual Defendants reviewed the Company's public statements and SEC filings related to the financial condition of the Company. These public statements failed to reveal the losses that the Company would incur because of the wrongdoing alleged herein.  Indeed, the Individual Defendants knew, or were reckless in not knowing, that the wrongdoing alleged herein would adversely affect SAIC's financial condition. As a result of the foregoing misconduct, the Individual Defendants have breached their fiduciary duties to the Company and have subjected the Company to hundreds of millions of dollars in losses, adverse publicity, additional costs and potential fines, and other occurrences harmful to the Company.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

51.     Plaintiff brings this action derivatively in the right, and for the benefit, of the Company to redress injuries suffered, and to be suffered, by the Company as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  The Company is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

52.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

53.     Plaintiff is the owner of SAIC common stock and was the owner of SAIC common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

54.     At the time that this action was commenced, the Company's Board consisted of the following directors: defendants Havenstein, Young, Córdova, Drummond, Frist, Hamre, John, Jones, Jumper, Kraemer, Nussdorf, Sanderson, and Simpson.

55.     As a result of the facts set forth herein, plaintiff has not made any demand on the Company's Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act with respect to each and every one of the Individual Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

a.      As the Company's CEO, defendant Havenstein is not an independent director capable of impartially considering a demand to commence and vigorously prosecute this action;

b.      Additionally, defendant Havenstein lacks independence from defendants Córdova, John, Kraemer, and Sanderson as they are defendants who are not disinterested and/or independent and who exert influence over the compensation for defendant Havenstein by virtue of their positions as members of the Human Resources and Compensation Committee.   The Human Resources and Compensation Committee annually reviews and approves corporate goals and objectives relevant to the compensation for defendant Havenstein, evaluates performance in light of those goals and objectives, and approves a level of compensation based upon these evaluations.   This lack of independence renders these defendants incapable of impartially considering a demand to commence and vigorously prosecute this action;

c.      Defendants face a substantial likelihood of being held liable for breaching their fiduciary duties of loyalty and good faith as alleged herein, and are therefore incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

d.      The Company's non-employee directors have received, and continue to receive, substantial compensation in the form of cash and stock option awards.   These defendants are interested in maintaining their positions on the Board so as to safeguard their substantial compensation and stock options.   The following chart illustrates the substantial compensation that these directors have received, which demonstrates that demand upon such individuals would be futile:

| 2011 DIRECTOR COMPENSATION | | | |
|---|---|---|---|
| **DIRECTOR** | **FEES EARNED OR PAID IN CASH** | **STOCK AWARDS** | **OPTION AWARDS** | **TOTAL** |
| France A. Córdova | $100,000 | $100,008 | $50,001 | $250,009 |
| Jere A. Drummond | $108,000 | $100,008 | $50,001 | $258,009 |
| Thomas F. Frist, III | $112,000 | $100,008 | $50,001 | $262,009 |
| John J. Hamre | $104,000 | $100,008 | $50,001 | $254,009 |
| Miriam E. John | $104,000 | $100,008 | $50,001 | $254,009 |
| Anita K. Jones | $110,000 | $100,008 | $50,001 | $260,009 |
| John P. Jumper | $90,000 | $100,008 | $50,001 | $240,009 |
| Harry M.J. Kraemer, Jr. | $127,000 | $100,008 | $50,001 | $277,009 |
| Lawrence C. Nussdorf | $39,000 | $100,001 | $49,999 | $189,000 |
| Edward J. Sanderson, Jr. | $124,000 | $100,008 | $50,001 | $274,009 |
| Louis A. Simpson | $116,000 | $100,008 | $50,001 | $266,009 |
| A. Thomas Young | $232,250 | $100,008 | $50,001 | $382,259 |

e.      The entire Board and senior management participated in the wrongs complained of herein.   For the reasons described herein, the Company's directors are not disinterested or independent.   Pursuant to their specific duties as Board members, each was charged with the management of the Company and the conduct of its business affairs.   Each of the above referenced defendants breached the fiduciary duties they owed to the Company and its shareholders in that they failed to prevent and correct the dissemination of the Company's false and misleading statements.   Thus, the Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome since their actions have subjected the Company to millions of dollars in potential liability for violations of applicable securities laws;

1         f.     Defendant Havenstein certified certain of the Company's SEC filings.

2   Accordingly, demand is futile as Havenstein faces a substantial likelihood of liability for breach

3   of fiduciary duties owed to the Company;

4         g.     Defendants Frist, Jones, Jumper, Kraemer, and Nussdorf were aware of

5

6   the Company's ongoing unlawful and improper business practices and the dissemination of

7   materially false and misleading statements and, yet, still permitted the Company to portray to

8   the public the Company's false and misleading information despite their heightened fiduciary

9   obligations as members of the Company's Audit Committee.   Specifically, the Company's

10  Audit Committee Charter provides the following:

11

12       The purpose of the Audit Committee (the "Committee") is to assist the Board
    of Directors (the "Board") in its oversight of: (i) the integrity of the Company's

13       financial statements, including the financial reporting process, system of
    internal control over financial reporting and audit process; (ii) compliance by

14       the Company with legal and regulatory requirements; (iii) the independent
    registered public accountants' qualifications and independence; (iv) the

15       performance of the Company's internal audit function and independent
    registered public accountants; (v) financial reporting risk assessment and

16       mitigation; (vi) the Company's systems of disclosure controls and procedures
    and internal controls over financial reporting; and (vii) the preparation of the

17       report of the Committee to be included in the Company's annual proxy
    statement in accordance with the rules and regulations of the Securities and

18       Exchange Commission (the "SEC"). In performing its duties, the Committee

19       will maintain effective working relationships with and open communication
    between the Board, management, internal auditors and independent registered

20       public accountants.

21

22       **Composition, Membership and Operation**

23       **Composition of Committee**

24
         The Committee will be composed of three or more directors, none of whom

25       may (i) as determined by the Board, have any relationship to the Company that
    may interfere with the exercise of his or her "independence" from management

26       and the Company, as such term is defined in the Company's Corporate
    Governance Guidelines; (ii) accept directly or indirectly any consulting,

27       advisory or other compensatory fee from the Company or any subsidiary other

28       than in his or her capacity as a director, a member of the Committee or a

member of any other Board committee; or (iii) be an affiliated person of the Company or any of its subsidiaries other than in his or her capacity as a director or a member of the Committee or a member of any other Board committee. All members of the Committee will be financially literate, or will become financially literate within a reasonable period of time after appointment to the Committee, and at least one member of the Committee will be an "audit committee financial expert," as such term is defined under the rules of the SEC, and shall have accounting or related financial management expertise, as the Board interprets such qualification in its business judgment. Members of the Committee, including the Committee Chair, shall be elected by the Board, taking into account the recommendations of the Nominating and Corporate Governance Committee, and members may be removed from the Committee by the Board. Committee members shall not simultaneously serve on the audit committees of more than two other public companies unless the Board determines that such simultaneous service would not impair the ability of such member to effectively serve on the Committee and discloses such determination in the Company's annual proxy statement.

**Operation of Committee**

A majority of the members of the Committee shall constitute a quorum for doing business. All actions of the Committee shall be taken by a majority vote of the members of the Committee present at a meeting at which a quorum is present or by unanimous written consent. The Committee Chair shall be responsible for leadership of the Committee, including preparation of meeting agendas. The Committee may, at its discretion, delegate such of its authority and responsibilities as the Committee deems proper to members of the Committee or a subcommittee.

**Meetings**

The Committee will have regularly scheduled meetings each year, with additional meetings to be held as circumstances require. The Committee will keep minutes of its meetings, and the Committee Chair will regularly report to the Board on its activities, making recommendations as appropriate, including the Committee's conclusions with respect to the qualifications, performance and independence of the independent registered public accountants, and will review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, its compliance with legal or regulatory requirements, the performance and independence of the independent registered public accountants or the performance of the internal audit function.

**Duties and Responsibilities**

The Committee's job is one of oversight and it recognizes that the Company's management is responsible for the preparation and certification of the

Company's financial statements and that the independent registered public accountants are responsible for auditing those financial statements. Additionally, the Committee recognizes that financial management, including the internal audit staff, and the independent registered public accountants, have more time, knowledge, and detailed information on the Company than do Committee members. Consequently, in carrying out its oversight responsibilities, the Committee is not providing any expert or special assurance as to the Company's financial statements or any professional certification as to the independent registered public accountants' work.

The following functions shall be the common recurring activities of the Committee, and are set forth as a guide with the understanding that the Committee may diverge from this guide as appropriate given the circumstances, other than as may be required by any rules of the SEC or any national securities exchange on which shares of the Company are listed.

**Internal Controls and Disclosure Controls**

Review and provide feedback as deemed appropriate on (i) the assessment performed by management on internal control over financial reporting for inclusion in the Company's Annual Report on Form 10-K with respect to quality, adequacy, and effectiveness of the Company's internal control structure and procedures for financial reporting; and (ii) the report and attestation of the independent registered public accountants regarding the Company's internal control over financial reporting.

Discuss with the independent registered public accountants, the internal auditor and management, on a quarterly basis, the Company's internal control over financial reporting and any fraud involving management or others with a significant role in the internal controls; review any major issues as to the adequacy of the Company's internal control over financial reporting and any special audit steps adopted in light of material control deficiencies; receive recommendations for the improvement of such control; and review whether any such previously approved recommendations have been implemented and any other significant changes in internal control over financial reporting have been made since the last evaluation.

Receive and review any disclosure from the Company's Chief Executive Officer or Chief Financial Officer made in connection with the certification of the Company's quarterly and annual reports filed with the SEC of (a) significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize, and report financial data, and (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

Review the disclosure controls and procedures of the Company designed to ensure timely collection and evaluation of information required to be disclosed in the Company's filings with the SEC or posted on the Company's website.

Review the independent registered public accountants' procedures and management of the audit relating to internal control over financial reporting.

**Independent Audit**

Retain an independent registered public accounting firm for the purpose of preparing or issuing an audit report on the consolidated financial statements of the Company and performing other audit, review or attest services; preapprove the compensation and fees to be paid to the independent registered public accountants; preapprove all audit and non-audit services to be performed by the independent registered public accountants in advance and evaluate the qualifications, performance and independence of the independent registered public accountants. The Committee shall have sole authority and responsibility to appoint, evaluate and, where appropriate, replace the independent registered public accountants and/or the lead audit partner, and the independent registered public accountants shall be ultimately accountable to and report to the Committee. The Committee shall oversee the work of the independent registered public accountants (including resolution of any disagreements between management and the independent registered public accountants regarding financial reporting). The Committee Chair shall have authority to preapprove audit and non-audit services provided by the independent registered public accountants as necessary between regular meetings of the Committee; provided that any such services so preapproved shall be disclosed to the full Committee at its next scheduled meeting.

Ensure the objectivity of the independent registered public accountants by reviewing and discussing all relationships between the independent registered public accountants and the Company and its affiliates, including: (i) requesting, receiving, and reviewing, on an annual basis, a formal written statement from the independent registered public accountants under applicable professional standards that delineates all relationships which may reasonably be thought to bear on the independence of the independent registered public accountants with respect to the Company in accordance with professional standards governing such independence; (ii) discussing with the independent registered public accountants any disclosed relationships or services that may impact the objectivity and independence of the independent registered public accountants; (iii) taking appropriate action in response to the independent registered public accountants' report; and (iv) establishing clear policies regarding the employment of current or former employees of the independent registered public accountants.

Obtain and review, at least annually, a report by the independent registered public accountants that describes (i) the independent registered public accountants' internal quality-control procedures; (ii) any material issues raised by the most recent internal quality-control procedures; (iii) any material issues raised by the most recent internal quality control review, or peer review, of the independent registered public accountants, or by any inquiry or investigation by governmental or professional authorities within the preceding five years, respecting one or more independent audits carried out by the independent registered public accountants, and any steps taken to address any such issues.

Meet separately and on a periodic basis with the independent registered public accountants and management to review the proposed audit scope and procedures to be utilized.

At the conclusion of each annual audit, review with the independent registered public accountants any audit problems or difficulties and management's response, including any difficulties encountered in the course of the audit work; any restrictions on the scope of the independent registered public accountants' activities or on access to requested information; any significant disagreements with management; any accounting adjustments that were noted or proposed by the independent registered public accountants but were not recorded by the Company (as immaterial or otherwise); any communications between the audit team and the national office respecting any significant auditing or accounting issues presented in the engagement; and any management or internal control letter issued, or proposed to be issued, by the independent registered public accountants to the Company in connection with the audit and any other comments or recommendations made by the independent registered public accountants; and such matters related to the conduct of the audit that are to be communicated to the Committee under generally accepted auditing standards.

Review (i) all critical accounting policies and practices to be used; (ii) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; (iii) analyses prepared by management and/or the independent registered public accountants setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including each alternative treatment of financial information within GAAP that has been discussed with management and an analyses of the effects of alternative GAAP methods on the financial statements; (iv) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements; and (v) other material written communications between the independent registered public accountants and management.

**Internal Audit**

Periodically review the qualifications, organizational structure and performance of the internal audit function and annually review the Internal Audit Department's charter. Give prior approval to any decision to appoint, replace, reassign, or dismiss the Director of the Company's Internal Audit Department. The Committee, through its Chair, shall also be required to concur in the total compensation being provided to the Director of the Internal Audit Department and sign off on his/her annual performance appraisal.

Review and approve on an annual basis the three year audit plan of the Internal Audit Department (the "internal audit plan"), which plan should be designed to systematically focus on the Company's risks and vulnerabilities.

Review and update on an annual basis the internal audit plan, including the independence and authority of the internal auditor's reporting obligations, the adequacy of internal audit resources, and the coordination and completeness of coverage between the internal auditors and independent registered public accountants.

Periodically review, with the Director of the Internal Audit Department, any significant difficulties, disagreements with management, or scope restrictions encountered in the course of the Internal Audit Department's work.

Receive periodic summaries of findings from completed internal audits and, as appropriate, the status of major audits in process. Receive progress reports on the completion of the current year's internal audit plan, including explanations for any significant deviations from the plan.

Receive timely notification of any issues or concerns identified during the course of internal audits.

Review and discuss with the independent registered public accountants, or others as appropriate, the responsibilities, budget and staffing of the Company's internal audit function.

**Financial Reporting**

Review and discuss with management and the independent registered public accountants the Company's annual audited consolidated financial statements that will be contained in its Annual Report to Stockholders and Form 10- K, including a review of the specific disclosures under "Managements Discussion and Analysis of Financial Condition and Results of Operations." Based on such review, recommend to the Board, in a written report to be included in the Company's proxy statement, whether the consolidated financial statements of the Company should be included in its Annual Report on Form 10-K.

Review and discuss with management, the independent registered public accountants and the internal auditor the quarterly consolidated financial statements of the Company, including a review of the specific disclosures under "Managements Discussion and Analysis of Financial Condition and Results of Operations," and the results of the independent registered public accountants' review of those statements. This review shall occur prior to the Company's filing of each Form 10-Q with the SEC.

Discuss with the independent registered public accountants the auditor's judgments about the quality and not just the acceptability of accounting principles used to prepare the Company's consolidated financial statements. Review the impact on the annual financial statements of any significant accounting and reporting issues, including recent professional and regulatory pronouncements and any newly adopted or proposed changes in accounting principles that would significantly affect the Company or its consolidated financial statements.

Review the Company's responses to investigations of the SEC or any national securities exchange on which shares of the Company are listed.

Review the type of information to be disclosed in, and type of presentation of, the Company's earnings press releases (paying particular attention to any use of "proforma" or "adjusted" non-GAAP information), discuss the earnings press releases and review any financial information and earnings guidance provided to analysts and rating agencies.

**Ethical and Legal Compliance**

Review the effectiveness of the Company's system for monitoring compliance with laws and regulations, including receiving reports from management on the results of management's review of compliance with the Company's policies and any investigations by management related to fraudulent acts or irregularities.

Establish procedures for the receipt, retention and treatment of complaints (including procedures for receiving and handling complaints on a confidential and anonymous basis) regarding accounting, internal accounting controls or auditing matters, including employee concerns regarding questionable accounting or auditing matters.

**Other Responsibilities**

Meet separately, periodically, with the internal auditor and with the independent registered public accountants to discuss any matters that the internal auditors, the independent registered public accountants or the Committee believe should be discussed privately without members of management present.

Meet separately, periodically, with management of the Company to discuss any matters management or the Committee believe should be discussed privately without the internal auditor or the independent registered public accountants present.

Review and discuss the adequacy of the Audit Committee Charter on an annual basis or more frequently upon changes to the membership of the Committee or as otherwise needed.

Discuss and evaluate the Company's guidelines and policies regarding risk assessment and risk management, including risks related to internal control over financial reporting, and discuss the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

Review with the Company's counsel the litigation, government investigation and legal compliance matters involving the Company that could have a significant impact on the Company's financial statements.

**Committee Self-Evaluation**

Conduct an annual self-evaluation of the performance of the Committee and report the results of the evaluation to the Board.

**Advisors**

The Committee shall have the authority to retain and obtain advice and assistance from independent legal, accounting or other advisors as it deems necessary to carry out its duties, without seeking Board or management approval. The Committee shall have the authority to approve such advisor's fees, expenses and the other terms of its retention. The Committee is authorized to cause the officers of the Company to provide such funding as the Committee shall determine to be appropriate for payment of compensation to the Company's independent registered public accountants and any advisers engaged by the Committee, and payment of ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

**Additional Duties and Responsibilities**

The Committee shall undertake such additional duties and responsibilities as the Board may from time to time prescribe.

As such, defendants Frist, Jones, Jumper, Kraemer, and Nussdorf breached their fiduciary duties of loyalty and good faith to the Company. Additionally, the failure of these defendants to

perform their duties as members of the Audit Committee with loyalty and in good faith raises a substantial likelihood of non-exculpated personal liability on their part.  As a result, defendants Frist, Jones, Jumper, Kraemer, and Nussdorf cannot impartially consider a demand on the Board to commence litigation against themselves;

h.      Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein thereby rendering demand futile;

i.      The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

j.      In order to bring this suit, all of the Company's directors would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

k.      The acts complained of constitute violations of the fiduciary duties owed by the Company's officers and directors and these acts are incapable of ratification;

l.      Each of the Individual Defendants authorized and/or permitted the false statements disseminated directly to the public and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if they instituted it;

m.      Any suit by the Company's current directors to remedy these wrongs would likely expose the Individual Defendants and the Company to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual

Defendants; thus, the Individual Defendants are hopelessly conflicted in making any supposedly independent determination whether to sue themselves; and

n.      The Company has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for the Company any part of the damages that the Company suffered and will suffer thereby.

56.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for the Company for any of the wrongdoing alleged by plaintiff herein.

57.     Plaintiff, moreover, has not made any demand on shareholders of the Company to institute this action since demand would be a futile and useless act for the following reasons: (1) SAIC is a publicly held company, with over 341 million shares outstanding and thousands of shareholders; (2) making demand on such a number of shareholders would be impossible for plaintiff who has no way of determining the names, addresses, or phone numbers of shareholders; and (3) making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

58.     Furthermore, the conduct alleged herein could not have been the product of good faith business judgment, and each of the Individual Defendants faces a substantial likelihood of liability for breaching their fiduciary duties because, through their intentional misconduct, they have subjected the Company to substantial damages.

1

2

### COUNT I
### (AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY)

3

4

59.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

5

6

60.     The Individual Defendants owed a fiduciary duty to the Company to supervise

7

the issuance of the Company's press releases and public filings to ensure that they were truthful

8

and accurate and that such filings conformed to applicable securities laws.   The Individual

9

Defendants, however, breached their fiduciary duties by failing to properly supervise and

10

monitor the adequacy of the Company's internal controls and by allowing the Company to issue

11

and disseminate misleading statements and filings.

12

61.     The Individual Defendants have engaged in a sustained and systematic failure to

13

14

exercise their oversight responsibilities and to ensure that the Company complied with

15

applicable laws, rules and regulations.

16

62.     As members of the Board, the Individual Defendants were directly responsible

17

for authorizing, permitting the authorization of, or failing to monitor the practices that resulted

18

19

in violations of applicable laws as alleged herein.   Each of the Individual Defendants had

20

knowledge of, actively participated in, approved, and/or acquiesced in the wrongdoing alleged

21

herein or abdicated his or her responsibilities with respect to this wrongdoing.   The alleged acts

22

of wrongdoing have subjected the Company to unreasonable risks of loss and expenses.

23

63.     Each of the Individual Defendants' acts in causing or permitting the Company to

24

25

disseminate material misrepresentations and omissions to the investing public and abdicating

26

his or her oversight responsibilities to the Company have subjected the Company to liability for

27

violations of applicable laws, and therefore were not the product of a valid exercise of business

28

1
2
judgment, constituting a complete abdication of their duties as officers and/or directors of the Company.

3
4
## COUNT II
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANGEMENT)

5
6
64.    Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

7
8
9
10
11
12
13
14
15
16
17
65.    The Individual Defendants had a duty to the Company and its shareholders to prudently supervise, manage, and control the operations, business, and internal financial accounting and disclosures of the Company.  The Individual Defendants, however, by their actions, and by engaging in the wrongdoing alleged herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of the Company in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, the Individual Defendants breached their duties of due care, diligence, and candor in the management and administration of the Company's affairs and in the use and preservation of the Company's assets.

18
19
20
21
22
23
24
25
66.    During the course of the discharge of their duties, the Individual Defendants were aware of the unreasonable risks and losses associated with their misconduct. Nevertheless, the Individual Defendants caused the Company to engage in the scheme described herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.  As a result, the Individual Defendants grossly mismanaged the Company, thereby causing damage to the Company.

26
27
28

1
2

### COUNT III
### (AGAINST THE INDIVIDUAL DEFENDANTS FOR CONTRIBUTION AND INDEMIFICATION)

3
4

67.     Plaintiff incorporates by reference each of the preceding paragraphs as though

5

they were set forth in full herein.

6
7

68.     The Company is alleged to be liable to various persons, entities and/or classes by

virtue of the facts alleged herein that give rise to defendants' liability to the Company.

8
9

69.     The Company's alleged liability on account of the wrongful acts, practices, and

10

related misconduct alleged arises, in whole or in part, from the knowing, reckless, disloyal

11

and/or bad faith acts or omissions of the Individual Defendants, and the Company is entitled to

12

contribution and indemnification from each Individual Defendant in connection with all such

13

claims that have been, are, or may in the future be asserted against the Company by virtue of the

14

Individual Defendants' misconduct.

15
16

### COUNT IV
### (AGAINST THE INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL)

17
18

70.     Plaintiff incorporates by reference each of the preceding paragraphs as though

they were set forth in full herein.

19
20

71.     The Individual Defendants' conduct, as alleged herein, constituted an abuse of

21

their control over the Company.

22

72.     As a direct and proximate result of the Individual Defendants' abuse of control,

23

the Company has suffered, and will continue to suffer, damages for which the Individual

24

Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

25
26
27
28

**COUNT V**
**(AGAINST THE INDIVIDUAL DEFENDANTS FOR**
**WASTE OF CORPORATE ASSETS)**

73.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

74.     The Individual Defendants' conduct, as alleged herein, constituted a waste of the corporate assets of the Company.

75.     As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

C.     Granting such other and further relief as the Court deems just and proper.

/ /

1

**JURY DEMAND**

2

Plaintiff demands a trial by jury.

3

4
DATED: February 10, 2012                      GLANCY BINKOW & GOLDBERG LLP

5
                                              By:  *s/ Lionel Z. Glancy*
                                              LIONEL Z. GLANCY

6                                             MICHAEL GOLDBERG
                                              EX KANO S. SAMS II

7                                             1925 Century Park East, Suite 2100
                                              Los Angeles, California 90067

8                                             Telephone: (310) 201-9150
                                              Facsimile: (310) 201-9160

9
                                              LAW OFFICES OF HOWARD G. SMITH

10                                            HOWARD G. SMITH
                                              3070 Bristol Pike, Suite 112

11                                            Bensalem, PA 19020
                                              Telephone: (215) 638-4847

12                                            Facsimile: (215) 638-4867

13                                            *Counsel for Plaintiff Edward Stellini*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VERIFICATION

I, Edward Stellini, hereby verify and declare that I have reviewed the Shareholder Derivative Complaint ("Complaint") in this action. The allegations contained within the Complaint are true and correct to the best of my knowledge, information, and belief. I have also authorized the filing of this Complaint.

I declare under penalty of perjury that the foregoing is true and correct.

DATED:        February _10_, 2012

Edward Stellini

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Edward Stellini

**DEFENDANTS**

SAIC, Inc.

**(b)** County of Residence of First Listed Plaintiff   Greene County, Ohio
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   San Diego
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Glancy Binkow & Goldberg LLP, 1925 Century Park East, Suite 2100, Los Angeles, CA  90067 (310) 201-9150

Attorneys (If Known)

'12CV0373 W     BLM

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
(U.S. Government Not a Party)

☐ 2   U.S. Government
Defendant

☒ 4   Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☒ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med. Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br>**LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 463 Habeas Corpus - Alien Detainee<br>☐ 465 Other Immigration Actions | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☒ 1   Original Proceeding

☐ 2   Removed from State Court

☐ 3   Remanded from Appellate Court

☐ 4   Reinstated or Reopened

☐ 5   Transferred from another district (specify)

☐ 6   Multidistrict Litigation

☐ 7   Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC Section 1332(a)(2)

Brief description of cause:
Breach of Fiduciary Duty, Gross Mismanagement, Abuse of Control, Waste of Corporate Assets

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE
02/10/2012

SIGNATURE OF ATTORNEY OF RECORD
s/Lionel Z. Glancy

**FOR OFFICE USE ONLY**

RECEIPT #              AMOUNT              APPLYING IFP              JUDGE              MAG. JUDGE